# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————————

No 24-1810

———————————————

In re: TRISTAN W. GILLESPIE

Respondent - Appellant

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
(1:21-mc-00014)

———————————————

RESPONDENT-APPELLANT'S BRIEF

Tristan W. Gillespie, Esq.

600 Blakenham Ct.
Johns Creek, GA 30022
404-276-7277
gillespie.tristan@gmail.com

1

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
## DISCLOSURE STATEMENT

No. _24-1810_____ Caption: In Re: Tristan W. Gillespie

Pursuant to FRAP 26.1 and Local Rule 26.1, Tristan W. Gillespie, Respondent-Appellant, makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?
   NO

2. Does party/amicus have any parent corporations?
   NO

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
   NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
   NO

5. Is party a trade association?
   NO

6. Does this case arise out of a bankruptcy proceeding?
   NO

7. Is this a criminal case in which there was an organizational victim?
   NO

Signature: */s/ Tristan W. Gillespie*                    October 21, 2024

# Contents

STATEMENT REGARDING ORAL ARGUMENT .................................................... 3

TABLE OF AUTHORITIES ........................................................................................ 4

I.     Statement Of Jurisdiction ................................................................................. 5

II.    Statement of Issues Presented for Review ...................................................... 5

III.   Statement of the Case ....................................................................................... 6

   A.     Introduction ................................................................................................. 6

   B.     Statement of Procedural and Factual History ....................................... 6

   C.     The Impact of the Disciplinary Order .................................................... 16

   D.     Standard Of Review ................................................................................. 18

IV.    Summary Of Argument .................................................................................. 18

V.     Argument ......................................................................................................... 21

   A.     Misrepresentation During Settlement Negotiations ............................ 21

   B.     Excessive Fee Demands .......................................................................... 30

   C.     "Familial Relationship" Between Pezza and Laufer ............................ 45

   D.     Duty To Correct Sarwar Testimony ...................................................... 47

   E.     No Further Proceedings Are Warranted ................................................ 47

VI.    Conclusion ....................................................................................................... 48

CERTIFICATE OF COMPLIANCE ....................................................................... 48

CERTIFICATE OF FILING AND SERVICE ......................................................... 48

## STATEMENT REGARDING ORAL ARGUMENT

No oral argument is requested.

## TABLE OF AUTHORITIES

**Cases**

1. **Laufer v. Ft. Meade Hospitality LLC**, 60 F.4th 156 (4th Cir. 2023) - 3, 5

2. **Laufer v. Naranda Hotels LLC**, SAG-20-2136 DE 26 (D. Md. 2020) - 3, 5

3. **Parks v. Richard**, 2020 U.S. Dist. Lexis 86790 (M.D. Fla. 2020) - 4

4. **Acheson Hotels LLC v. Laufer**, 22-429 (U.S.) - 5

5. **Newman v. Piggie Park Ent. Inc.,** 390 U.S. 400 (1968) - 31, 32

6. **Christiansburg Garment Co. v. EEOC**, 434 U.S. 412 (1978) - 32

7. **Albemarle Paper Co. v. Moody**, 422 U.S. 405 (1975) - 32

8. **Northcross v. Board of Education**, 412 U.S. 427 (1973) - 32

9. **Hensley v. Eckerhart**, 461 U.S. 424 (1983) - 32

10. **Alyeska Pipeline Service Co. v. Wilderness Society**, 421 U.S. 240 (1975) - 32

11. **Blue v. United States Dep't of Army**, 914 F.2d 525 (4th Cir. 1990) - 15

12. **In re Kunstler**, 914 F.2d 505 (4th Cir. 1990) - 15

13. **Byrd v. Hopson**, 108 Fed. Appx. 749 (4th Cir. 2004) - 15

14. **United States v. Galecki**, 932 F.3d 176 (4th Cir. 2019) - 15

15. **Bruce v. City of Gainesville**, 177 F.3d (11th Cir. 1999) - 33

16. **Kennedy v. KSK Invs. LLC**, 6:17-cv-640 (M.D. Fla. 2017) - 38

17. **Kennedy v. Satya Group LLC**, 2:17-cv-14393 (S.D. Fla. 2018) - 40

**Statutes**

1. **42 U.S.C. § 12205** (Americans with Disabilities Act) - 32

2. **29 U.S.C.A. § 1291** - 1

**Rules**

1. **Fed. R. Civ. P. 11** - 39

Appellant, Tristan W. Gillespie, representing myself, hereby files this Appellant's Brief.

## I.     Statement Of Jurisdiction

This is an appeal from an Order of the United States District Court for the District of Maryland dated August 7, 2024 (1:21-mc-00014), incorporating portions of its prior Order dated July 5, 2023, disciplining me and suspending me from the practice of law before that Court for a period of four months. I filed my Notice of Appeal on August 27, 2024.   Appellate jurisdiction is authorized by 29 U.S.C.A. §1291. This appeal is from a final order and judgment that disposes of all claims.

## II.    Statement of Issues Presented for Review

1.     Whether the District Court erred in ruling that I had misrepresented entitlement to fees, costs and litigation expenses in seeking the same from defendants.

2.     Whether the District Court erred in ruling that I had misrepresented the fees to which I was entitled to negotiate with defendants.

### III.    Statement of the Case

#### A.    Introduction

This is an appeal from a Disciplinary Order from the United States District Court for the District of Maryland (hereinafter "District Court") which incorporated a prior Disciplinary Order finding that I had committed several ethical violations and suspending me from practice for a period of four months.

#### B.    Statement of Procedural and Factual History

I was hired by the law firm of Thomas B. Bacon, P.A. to handle Title III Americans with Disabilities Act cases, 42 U.S.C., Sections 12181, et seq. (hereinafter "ADA"), in United States District Courts in numerous states. This included the several cases filed in the District of Maryland which gave rise to its commencement of disciplinary proceedings and the issuance of two disciplinary orders issued July 5, 2023 (hereinafter "Disciplinary Order") and August 7, 2024 (hereinafter "Supplemental Disciplinary Order").

I filed ADA actions on behalf of disabled plaintiffs who had reviewed hotel online reservations systems and encountered discrimination because the reservations systems failed to comply with the Regulation set forth at 28 C.F.R. Section 36.302(e). In the District of Maryland, the plaintiffs I represented were Saim Sarwar and Deborah Laufer - both disabled persons.

Although both Laufer and Sarwar had plans to travel to the numerous states

in which they filed ADA cases[1], the allegations of their initial complaints were couched strictly in terms of tester standing based solely on their review of discriminatory online reservations systems without referencing their travel plans. The purpose of this strategy was to develop the law of tester standing as applied to hotel online reservations systems.[2] Previously, Attorney Bacon had won the first Circuit Court case recognizing tester standing in Title III.[3] This was followed by several other Circuits[4], including the Fourth Circuit[5].

The issue of whether testers have standing for online reservation discrimination initially underwent a divide among the various district courts. In the District of Maryland, two courts ruled that such testers do not have standing. See *Laufer v. Ft. Meade Hospitality, LLC*, 8:20-cv-1794-PX, DE 8 (D. Md., Xinis J. 11/10/20); *Laufer v. Naranda Hotels, LLC*, SAG-20-2136, DE 26 (D. Md., Gallagher, J. 12/16/20), *reversed and vacated*, *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2/15/23).  Other district courts, however, had ruled that testers

---

[1] Indeed, both Laufer and Sarwar traveled through Maryland.

[2] On the flip side, pleadings which allege a disabled plaintiff's travel plans to the area of the hotel are unavailing because there are simply too many ways district courts will dismiss such cases. This was proven true in the cases referenced below whereby Laufer traveled to Colorado in 2021, Sarwar had traveled through Vermont in 2021, and plaintiff Ashleigh Mackin had planned to travel to New Mexico.

[3] *Houston v. Marod Supermarkets, Inc*., 733 F.3d 1323 (11th Cir. 2013).

[4] *Suarez-Torres v. Panaderia Y Reposteria Espana, Inc*., 988 F.3d 542 (1st Cir. 2021); *Mosley v. Kohl's Dep't Stores*, 942 F.3d 752 (6th Cir. 2019); *Civil Rights Educ. & Enforcement Ctr. v. Hosp. Properties Trust*, 867 F.3d 1093, 1101-02 (9th Cir. 2017); *Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1211 (10th Cir. 2014).

[5] *Nanni v. Aberdeen Marketplace, Inc*., 878 F.3d 447 (4th Cir. 2017).

have standing. See, e.g., *Parks v. Richard*, 2020 U.S. Dist. Lexis 86790 (M.D. Fla. 2020).

The Circuit Courts joined in this divide. At first, the Fifth, D.C., Tenth and Second Circuits ruled that testers do not have standing.[6] Then, however, the Eleventh, First and finally this Circuit Court ruled that testers do have standing.[7]

The non-prevailing defendant in the First Circuit's filed a petition for writ of certiorari to the Unites States Supreme Court. *Acheson Hotels, LLC, v. Laufer*, 22-429. The Supreme Court granted certiorari on March 27, 2023, and scheduled the matter for oral argument on October 4, 2023.

The sheer weight of amicus briefs[8] filed in the Supreme Court case on behalf of a slew of groups demonstrated the critical importance of a decision on the merits. As the numerous briefs set forth, a ruling on the merits in Laufer's favor would have preserved and protected the rights of disabled and other civil rights plaintiffs. By contrast, a ruling against Laufer would have severely restricted civil

---

[6] *Laufer v. Mann Hospitality, L.L.C.*, 996 F.3d 269 (5th Cir. 4/28/21); *Laufer v. Alamac*, Inc., 21-7056 (D.C. Cir., 9/10/2021) (unpublished opinion*); Laufer v. Looper*, 22 F.4th 871 (10th Cir. 1/5/22); *Harty v. West Point Realty*, Inc., 28 F.4th 435 (2d Cir. 3/18/22); *Laufer v. Ganesha Hosp., LLC*, 2022 U.S. App. Lexis 18437 (7/5/22) (unpublished).

[7] *Laufer v. Arpan*, *LLC*, 29 F.4th 1268 (3/29/22), petition for rehearing en banc denied, 2023 U.S. App. Lexis 8785 (11th Cir. 4/12/23), vacated on other grounds, *Laufer v. Arpan LLC*, 2023 U.S. App. LEXIS 21253 (11th Cir. 8/15/23); *Acheson Hotels, LLC*, 50 F.4th 259 (1st Cir. 10/5/22); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2/15/23).

[8] Eight amicus briefs were filed on behalf of numerous associations against tester standing. Eight amicus briefs were also filed in support of tester standing. This latter group (in favor) includes the States of Massachusetts, Connecticut, D.C., Illinois, Maryland, New Jersey, New York, Oregon and Washington.

rights. In short, the issue before the Supreme Court was whether a disabled plaintiff suffered Article III injury for having encountered discrimination within the plain meaning of the statute.

By way of procedure in the Maryland District Court, Judge Xinis had initially denied Plaintiff Laufer's motion for default judgment based on tester standing in *Laufer v. Ft. Meade Hospitality, LLC*, LLC, 8:20-cv-1974-PX, (D. Md. 11/10/20). The case was reassigned to Judge Gallagher on Nov. 19, 2020. On Dec. 1, 2020, Judge Gallagher conducted an evidentiary hearing in *Ft. Meade* and in *Laufer v. Naranda Hotels, LLC*, SAG-20-2136. During that hearing, Laufer testified about her upcoming plans to engage in a cross-country excursion with her granddaughter to various states, including Maryland[9]. On December 16, 2023, Judge Gallagher issued a Memorandum Opinion in both cases expressing doubt over Laufer's credibility and holding that she lacks standing. That same day, Laufer filed a Notice of Appeal in both cases to this Circuit Court.[10]

Four days later, on December 20, 2020, Judge Gallagher referred the matter to the Disciplinary & Admissions Committee. DE 6, Report & Recommendation by Evan Shea, Investigator, p. 1 (hereinafter Investigator Report). On January 7,

---

[9] In July 2021, Laufer proved her testimony to be true when she did indeed carry out her travel plans, including travel through Maryland.

[10] On February 15, 2023, this Circuit Court reversed the District Court's ruling. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2/15/23).

9

2021, the Court appointed Evan T. Shea as Attorney-Investigator (hereinafter

"Investigator") to investigate the following charges:

> 1. Whether I suborned perjury by submitting false declarations from
> Laufer regarding her travel plans through the area and permitted her to
> take the stand regarding the same.

> 2. Whether I failed to cite the prior decision by Judge Xinis which
> denied Laufer's motion for default judgment based on standing.

> 3. Whether I had filed frivolous lawsuits, bought solely to extract
> exorbitant settlements from hoteliers.

> 4. Whether I had made misrepresentations to other courts via fee
> petitions which (1) failed to disclose my employment with the DA's
> Office in Atlanta; and (2) appeared to inflate the number of hours
> spent litigating ADA cases.

Investigator Report, p. 2.

The Investigator informed me of the above charges at the inception of his

investigation, which took place over the course of the next several months. During

this period, we exchanged numerous emails. The Investigator requested several

documents[11] and I provided them without objection. The Investigator interviewed

me, Attorney Bacon, and plaintiffs Sarwar and Laufer. During this period, the

investigation was thorough. The Investigator put me on notice of the specific

nature of the charges against me and we (myself and Attorney Bacon) were able to

provide him with all the information he needed to generate his Report &

---

[11] The Investigator requested these documents by letter dated March 19, 2021. Exhibit A.

Recommendation. The Investigator found that there was no perjury - Laufer having already traveled the country as she planned. In this regard, Laufer traveled with her granddaughter through such states as Texas to Colorado, then back through Northern States to the Northeast, then back to Florida through Maryland. The Investigator also found no evidence of any improper payments to plaintiffs. He found that the cases I filed were not frivolous (referencing the conflict of authorities existing as of that time). He found I did not err in failing to cite the prior Judge Xinis opinion in the *Naranda* case before Judge Gallagher. The Investigator's Report exonerated us (myself and Attorney Bacon) on all but two aspects: (1) that I had inflated my timesheets[12]; and (2) that my initial fee demand during settlement negotiations was excessive.[13] The Investigator also recommended only that I be warned and admonished to ensure accurate fee petitions and representation of my attorney time and did not recommend any formal proceedings. Investigator Report, p. 36.

As set forth in the Show Cause Order dated March 9, 2022, the District

---

[12] On this point, the Investigator, at p. 36, incorrectly stated that Mr. Bacon had some degree of involvement with the generation of my timesheets and fee petitions. This was not correct. Mr. Bacon played no part in the creation or keeping of my timesheets or my fee petitions and was unaware of their contents or any issue with them until the Investigator released his Report.

[13] Although the Investigator was provided ample information on this point, his Report omitted several aspects that were critical and, if included, would have warranted a different result.

Court did not accept these recommendations. It Ordered me to show cause why I should not be more severely disciplined, but only referenced "for the reasons stated in the Attorney-Investigator's report and recommendation." The Order also required me to submit copies of any fee petitions I had filed on or after July 22, 2021. I timely submitted my brief in response to the Show Cause Order. On June 1, 2022, the District Court issued an Order setting the matter for hearing before a three-judge panel consisting of Judge Paula Xinis (Chair)[14], Judge Deborah L. Boarman, and Judge Ajmel A. Quereshi. The Order stated:

> The Court has reviewed the response and remains concerned with the veracity of Respondent's fee petitions filed in this[15] and other courts; the nature of Respondent's relationship with his clients and certain personnel with whom he works; and more generally repeated misrepresentations made during this investigation and to other tribunals.

Thereafter, only two other events placed me on notice of the charges against me. On July 25, 2022, the Investigator sent me an email requesting (1) whether we continued to make the same settlement offers to defendants; (2) whether we represent to our clients that our fee agreements are contingent or whether we ever collect our fees from our clients; and (3) the events concerning testimony in Vermont by Sarwar regarding Mr. Pezza's role in the trip he took. See Exhibit B

---

[14] Judge Xinis had previously ruled against Laufer's standing in the Ft. Meade case. 8:20-cv-1794-PX, DE 8 (D. Md., Xinis J. 11/10/20).

[15] I filed no fee petitions in the District of Maryland.

attached hereto. I responded by email dated August 10. See Exhibit C.

On September 9, 2022, the Investigator served me with his Supplemental Report, Exhibit D attached hereto. In his Supplemental Report, the Investigator made only one new charge - that I had failed to correct the Vermont testimony of Plaintiff Sarwar regarding whether Mr. Pezza (the pre-suit investigator) was paid to accompany him on his trip. The Investigator also stated that I had not altered settlement demands at all (even though I had long before ceased filing ADA cases[16]), and only modified my fee petitions after his initial Report was served.

Other than that described above, I was put on notice of no other charges.

On September 23, 2022, the three judge Panel held a hearing. On June 30, 2023, the Panel issued its Report and Recommendation, which is attached to the Order dated July 5, 2023. DE 14. (The Panel's Report and Recommendation and Order and Court's Order are hereinafter collectively referred to as the "Disciplinary Order".)

The Disciplinary Order found that I had committed several ethical violations, including certain excessive entries in several fee petitions, my failure to include reference in my resume to my employment with the DA's office, and that I had made a misrepresentation with respect to my "anticipated future time"

---

[16] It was therefore unlikely that I had made any fee demands during the time period in question.

referenced in settlement demands. These were the only specific charges of which I was made aware prior to the hearing. Indeed, these were the only charges on which I was put on any kind of reasonable notice prior to the hearing.

The Disciplinary Order's most inflammatory and damaging findings, made in addition to the above, were based on entirely new charges for which I did not receive any reasonable notice prior to the hearing. These were: (1) that an ethical violation was committed because I never conferred with plaintiffs Sarwar or Laufer; and (2) that every fee demand ever made by us (myself and Attorney Bacon) was a misrepresentation because we were never entitled to our fees in the first place. The Disciplinary Order also raised for the first time the "unanswered" question with no "firm conclusions" that the pre-suit investigator, Daniel Pezza served only as some kind of conduit to make illicit payments to Plaintiff Laufer.

On July 21, 2023, I filed a Motion for Reconsideration of the Disciplinary Order. DE 15. I filed the Notice of Appeal on July 26, 2023. DE 16. On August 9, 2023, the District Court denied my Motion for Reconsideration, DE 19.

On November 14, 2023, this Circuit Court issued an unpublished Opinion vacating and remanding the District Court decision on the singular ground that the District Court had denied me procedural due process because it failed to adequately notify me of some of the specific charges against me. In this regard,

14

this Circuit Court stated, at p. 3:

> We conclude that the district court failed to provide
> adequate notice to Gillespie of its intent to rely on the
> adequacy of his communication with, and representation
> of, his clients as part of its determination of whether to
> discipline him.[17]

This Circuit Court therefore remanded the matter for further proceedings.

These proceedings included additional investigation by the Investigator and a

hearing on March 18, 2024. The District Court thereafter issued its Supplemental

Report & Recommendation on August 7, 2024, [DE 42], accepting the

Investigator's recommendation that I had not violated the duty to keep clients

reasonably informed and the District Court held that I was not responsible. The

Court incorporated the findings in the Disciplinary Order with respect to all other

violations and reinstated my suspension for a period of four months, having

already been served. This was a reduction from the suspension of six months

initially imposed in the original Disciplinary Order.  On August 7, 2024, the Chief

District Judge issued a Final Disciplinary Order adopting the Supplemental Report.

DE 43.

I filed the instant appeal on August 27, 2024. DE 46.

---

[17] In a footnote on p. 4 of its Opinion, this Circuit Court also rejected my claim that the
District Court had failed to provide me with adequate notice as to whether I had made
misrepresentations to opposing counsel that the plaintiffs owed us a debt. This issue will be
discussed, *infra*. Otherwise, this Court did not address the other issues presented.

**C.**    ***The Impact of the Disciplinary Order***

The impact of the Disciplinary Order was catastrophic.  The disciplinary investigation and proceedings lasted two and a half years from December 2020 until July 5, 2023, when the Maryland Court issued its Order. As previously stated, a conflict among the Circuits existed on the issue of whether Laufer had suffered Article III injury for having encountered discrimination within the plain meaning of the statute. The Maryland District Court's Disciplinary Order of July 5, 2023, issued in the middle of the briefing schedule before the Supreme Court, completely usurped that issue and became dominate to the debate.  Rather than being about the merits of tester standing under Article III, the issue then became the District Court's findings of outrageous unethical conduct by Laufer's attorneys: specifically, myself and Attorney Bacon. See, e.g. Wall Street Journal: "A Gambit to Duck Supreme Court Review".[18] I was never an attorney in the Supreme Court case. However, Mr. Bacon was. Mr. Bacon withdrew as counsel in that case because of the Maryland Disciplinary Order. Laufer thereby abandoned her claims, and her remaining/replacement counsel moved to dismiss based on mootness.

The Supreme Court issued its decision on December 5, 2023. Although this was after the Disciplinary Order having been vacated by this Circuit Court, the Supreme Court nonetheless reiterated the District Court's findings as though they

---

[18] https://www.wsj.com/articles/a-gambit-to-duck-supreme-court-review-93c99aac.

were valid. In this regard, the Court stated:

> After we granted review, the case took an unusual turn. In July, the United States District Court for the District of Maryland suspended Laufer's lawyer, Tristan Gillespie, from the practice of law for defrauding hotels by lying in fee petitions and during settlement negotiations. [Citation omitted.] It based the suspension on a report finding that Gillespie demanded $10,000 in attorney's fees per case even though he used "boilerplate complaints." [Citation omitted.] In addition, Gillespie funneled six-figure sums to the father of Laufer's grandchild for investigatory work that he never performed, raising the prospect that either Gillespie or Laufer (or both) got a cut of the money. [Citation omitted.] Making matters still worse, the sanctions order against Gillespie also implicated Laufer's former counsel of record before this Court, Thomas Bacon. [Citation omitted.]

As shown above, the Supreme Court accepted the District Court's previously vacated findings as remaining valid. It even built on those findings with descriptions like "defrauding hotels" and "funneled six-figure sums".

Not only did the Maryland Disciplinary Order cause the above disaster before the Supreme Court, but it also resulted in the vacating of the favorable decisions before the First Circuit, in *Acheson*, and this Circuit, in *Naranda*.[19]  Thus, the three Circuit Court opinions in favor of standing were nullified.

Additionally, because of the Disciplinary Order, the New York State bar is

---

[19] The Eleventh Circuit's favorable decision in *Arpan* was also vacated on the grounds that the *Arpan* defendant had long since divested itself of the subject hotel and ceased to exist as a corporate entity.

presently seeking to impose reciprocal discipline on me for <u>one year</u>. The majority of my law practice is based in New York, and I presently have hundreds of active cases there.

### D.    Standard Of Review

The standard of review of sanctions imposed on an attorney by a district court is abuse of discretion. *Byrd v. Hopson*, 108 Fed. Appx. 749, 754-55 (4th Cir. 2004), citing *Blue v. United States Dep't of Army*, 914 F.2d 525, 538 (4th Cir. 1990). See also *In re Kunstler*, 914 F.2d 505, 513 (4th Cir. 1990). Moreover, issues presented to, but not addressed, in the earlier appeal may be addressed herein. *United States v. Galecki*, 932 F.3d 176, 188 (4th Cir. 2019)("Our decision to 'not address' every issue in the first appeal [citation omitted] had no bearing on the merits of the unaddressed claims,"); *Mcknight v. Circuit City Stores, Inc.*, 14 fed appx 147, 154 (4th Cir. 2001)(where court ruled on one issue that was dispositive, it did not impact other issues not addressed).

## IV.    Summary Of Argument

As explained more fully below, the District Court abused its discretion for several reasons.

The Disciplinary Order's first finding - that I had failed to communicate with my clients - was disposed of favorably in the District Court's Supplementary

Report.

The Disciplinary Order's second finding is that I misrepresented to defendants the fact that I (and attorney Bacon) were entitled to our fees, costs and litigation expenses (hereinafter collectively referred to as "fees") in the first place. According to the Disciplinary Order, because our clients did not pay us when we lost a case, this constitutes a "phantom debt" and, therefore, we are not entitled to request our fees from anybody. This is entirely incorrect. We never made any such representation (that our clients owed us when we lose). More importantly, the Disciplinary Order entirely ignores the fact that we are entitled to fees pursuant to 42 U.S.C. Section 12205. As the Supreme and other courts have recognized, this is because civil rights plaintiffs cannot afford to pay their attorneys. The Disciplinary Order thereby has fashioned its own brand-new version of the law, contrary to ample precedent, then declared that we had been fraudulent on the basis of this new theory of law.

The Disciplinary Order's third finding - that I and the Bacon Law Firm, made excessive fee demands - was a subject that was thoroughly explained to the Investigator. While there were several aspects to the explanation, the Investigator made his finding of unethical conduct (which was followed by the Panel) only by ignoring all but one of those aspects. The Investigator and Disciplinary Order

ignored the fact that we also offered lesser initial demands with lower amounts, that we always offered to let the courts determine fee amounts, that we offered additional considerations to which the defendants were not entitled, and that these were only initial demands which always ended up being negotiated downward. The Investigator and Disciplinary Order ignored all this and only considered one aspect, specifically the reference to "anticipated future time" as being included in initial settlement demands. With respect to this term, the Investigator and Panel focused exclusively on the finding that I had never spent any additional time AFTER a case had closed. Critically, they inexplicably overlooked the fact that I frequently expended such additional time AFTER the settlement offer was made but BEFORE the case closed. In other words, it was entirely reasonable to make this initial demand when it was impossible to predict whether, and to what extent, the given case would continue to litigate before conclusion.

The Disciplinary Order also speculated on the "unanswered" questions about our pre-suit investigator, Daniel Pezza. Although it did not reach any "firm conclusions", the accusations contained in its findings clearly played a role in its disciplinary decision and were accentuated by the Supreme Court. Again, I had no advance reasonable notice of this charge. For many years prior to Bacon ever having represented Laufer, Pezza served as a pre-suit investigator on ADA cases

involving physical violations at brick-and-mortar facilities. He had served as a pre-suit investigator on cases involving screen reader software compatibility of commercial websites. He also served as a pre-suit investigator involving hotel online reservations systems prior to Laufer and for plaintiffs other than Laufer. His role was critical to cases, and he never gave any funds to Laufer. The Disciplinary Order's speculation on this point was unwarranted and inflammatory in the extreme. Not only is his work critical to ensure against violation of Fed. R. Civ. P. 11, but the screenshots he took in pre-suit investigations were often used as exhibits in litigation.

## V.    Argument

### A.    *Misrepresentation During Settlement Negotiations*

The District Court found that I and the entire Bacon Firm engaged in mass fraud in a thousand cases with respect to our settlement negotiations.  This finding is completely unwarranted in many respects.

The Panel's reasoning is as follows. First, the Panel opined that I and the Bacon firm engaged in misrepresentation and fraud by demanding ANY attorney fees, costs and litigation expenses (hereinafter simply "fees"), because we were never legally entitled to them in the first place. To support this conclusion, the Panel cited the passage in the client agreements that we are entitled to our fees and

the hourly rates we seek, then cited a passage that we seek those fees from

defendants. It then reasoned that, because our clients never pay us, we are entitled

to nothing ("phantom debt") and our claim to the contrary is a commission of

fraud.[20]

In a footnote on p. 4 of its Opinion vacating the District Court's decision,

this Circuit Court rejected my due process argument on this issue. Specifically, this

Court stated:

> In the disciplinary panel's view, Gillespie's
> settlement demands misled opposing counsel into
> believing that his clients owed attorney's fees that the
> clients had never actually incurred. Our review of the
> record, however, confirms that Gillespie received ample
> notice that the panel was concerned with the misleading
> nature of his settlement demands and agreements. We
> reject his claim.

I do not therefore make the same due process argument on this point that I

made in my previous appeal.  This is not necessary because the matter is not

evidentiary; rather it is a misinterpretation of the law. I do reiterate, however, that I

was not put on specific notice of this charge prior to the hearing. The Investigator's

---

[20] At pp. 18-19, the Court described our relationship with our clients as a "bait and switch" because the retainer agreements describe our right to be compensated in one part, and state that we will seek compensation from defendants in another part. This makes no sense. To the contrary, Merriam-Webster Dictionary defines "bait and switch" as follows:

      1       a sales tactic in which a customer is attracted by the advertisement of a low-priced item but is then encouraged to buy a higher-priced one

      2       the ploy of offering a person something desirable to gain favor (such as political support) then thwarting expectations with something less desirable[.]

Report and Recommendation was entirely devoid of any reference to whether our clients owed us a debt or whether we had made any representations to third parties to this effect. The Investigator had requested the client retainer agreements (among various other documents) in request no. 3 in his March 19, 2021, letter to me (Exhibit A) and I provided them. However, neither the Investigator's Report nor Supplemental Report made any reference to either the retainer agreements or the charge ultimately made in the Disciplinary Order. The only notice I received on this point was the Investigator's July 25, 2022, email (Exhibit B) inquiring whether our clients ever pay us. This seemingly innocuous question was hardly sufficient to place me on notice of the charge ultimately made. This inquiry was one of many questions and requests put to us by the Investigator in the discovery process. Moreover, the District Court's Show Cause Order, DE 7, instructed me only to show cause why I should not be disciplined for "the reasons stated in the Attorney-Investigator's report and recommendation." In its subsequent Order, dated June 1, 2022, the Court indicated that it remained "...concerned with the veracity of Respondent's fee petitions filed in this and other courts; the nature of Respondent's relationship with his client and certain personnel with whom he works; and more generally repeated misrepresentations made during this investigation and to other tribunals."

At no time prior to the hearing was I ever apprised of the charge that I had

made any representation (or misrepresentation) to any other party that our clients paid us if we lost a case, or that any debt existed (phantom or otherwise). The first time this theory was made known to me was at the hearing.

There simply was no evidence whatsoever to support the District Court's finding. The Investigator's report is completely devoid of any discussion on this topic. The written demand language cited by the District Court and the Investigator is also completely devoid of any such representations. Quite simply, during negotiations we never represented to any opposing that our clients paid us if we lost (and therefore could not recover our fees from the defendant).

Moreover, the Disciplinary Order's conclusion is legally erroneous in many respects.

First, despite countless fee petitions having been filed and the client agreements occasionally being submitted with them, no court has even remotely made such a holding. Indeed, we are aware of no court ever raising it as a possible issue or expressing any criticism of such agreements with clients. The Disciplinary Order created this notion of the law entirely by its own fashion, only to then qualify it as a predicate element of mass fraud.

Second, contrary to the Disciplinary Order's finding, as stated above, we never represented to anybody that our clients were indebted to us or must pay us in

the event we cannot recover from the defendants. The District Court's sole basis for its finding was the language of our fee demands. However, nothing in the plain language of our settlement demand contains any such representation.[21] The District Court simply created this fact out of thin air.

The District Court's finding is contrary to law. The District Court's logic is based on the notion that we are only entitled to recover our fees (costs and litigation expenses) from defendants **if our clients pay us when we lose**. In other words, unless our clients pay us every time a case is lost (i.e., because a court holds that they lack standing), we have no legal right to seek our fees from defendants.

This logic completely ignores long-standing civil rights laws. Our entitlement to fees comes directly from the plain and unambiguous language of the statute itself. Under 42 U.S.C. Section 12205, a disabled person who encounters discrimination is (having commenced an action under the chapter) is entitled to a "reasonable attorney's fee, including litigation expenses, and costs..."

In *Newman v. Piggie Park Ent., Inc*., 390 U.S. 400, 402 (1968), the Supreme Court held that civil rights plaintiffs are entitled to recover their fees unless special circumstances would render such an award unjust. The Court explained:

> When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he

---

[21] Whereas the Investigator accurately quotes our settlement demand at p. 18 of his Report, the Disciplinary Order, at p. 8, only paraphrases it with omissions.

25

does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. **If successful plaintiffs were routinely forced to bear their own attorneys' fees**, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees -- not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

*Id*. (Emphasis added.)[22] See also *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 415-16 (1978), citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), and *Northcross v. Board of Education*, 412 U.S. 427 (1973). In *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983), the Supreme Court stated,

In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975), this Court reaffirmed the "American Rule" that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary. In response Congress enacted the Civil Rights Attorney's fees Awards Act of 1976, 42 U. S. C. § 1988, authorizing the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation. **The purpose of § 1988 is to ensure "effective access to the judicial process**" for people with civil rights grievances. H. R. Rep. No. 94-1558, p. 1

---

[22] Although this involves the Civil Rights Act, the statutory enforcement mechanisms are the same. In *Newman*, this mechanism was 42 U.S.C. Section 2000a-3(a). This is the same section identified by 42 U.S.C. Section 12188(a) - which applies to the case at bar. In any event, this analysis applies equally to the ADA. See, e.g., *Ward v. Phila. Parking Auth*, 634 Fed. Appx. 901, 906 n. 31 (3d Cir. 2015); *Bruce v. City of Gainesville*, 177 F.3d 949 (11th Cir. 1999). See also *Bercovitch v. Baldwin Sch., Inc*., 191 F.3d 8, 10-11 (1st Cir. 1999) (attorney's fee provision in ADA intended to be interpreted consistently with other civil rights laws).

> (1976). Accordingly, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" S. Rep. No. 94-1011, p. 4 (1976) (quoting *Newman v. Piggie Park Enterprises, Inc*., 390 U.S. 400, 402 (1968)).

(Emphasis added.) See also *Albemarle*, 422 U.S. at 415 (reasoning that the strong public interest in having injunctive actions brought to remedy civil rights violations can only be vindicated if successful plaintiffs, acting as "private attorneys general," are awarded attorneys' fees in all but very unusual circumstances).

Courts have noted that the purpose of such fee shifting provisions is that civil rights plaintiffs can NOT afford to pay their attorneys. See *Newman*, 390 U.S. 402; *Bruce*, 177 F.3d at fn. 2. Because civil rights plaintiffs cannot afford to pay their attorneys, Congress created fee-shifting statutes to ensure "effective access to the judicial process". *Hensley*, 461 U.S. at 429. Several lower courts also recognized that the purpose behind attorney fee statutes in the ADA and other civil rights cases is that the plaintiffs cannot afford to pay. *Dowdell v. Apopka*, 698 F.2d 1181, 1190 (11th Cir. 1983)(civil rights lawyers entitled to recover their litigation expenses because "the client, as is often the case, cannot afford to pay for them..."); *Kennedy v. Chet Enters*., 2021 U.S. Dist. LEXIS 153303, * 13 (N.D. Ga. 2021) (applying same reasoning to Section 12205); *Laufer v. Khamlai5169*

*Lodging LLC*, 2021 U.S. Dist. LEXIS 204533, *12 (N.D. Ga. 2021)[23] (same);

*Disabled Patriots of Am., Inc. v. Reserve Hotel, Ltd.*, 659 F.Supp.2d 877, 888

(N.D. Oh. 2009) ("it is clear that Congress, in enacting the fee-shifting provisions

of the ADA, as with other civil rights statutes, intended to ensure access to rights

by those who could not afford to retain lawyers ...)

The case law which awards fees in the ADA based on the law cited above is

too voluminous to cite. Quite simply, however, there is nothing which supports the

Disciplinary Order's legal analysis, and the District Court inexplicably ignored the

fee-shifting provision of the Statute and applicable case law applying it. Indeed, it

is impossible to separate the Disciplinary Order's theory from applying to all ADA

and other civil rights cases whereby attorneys represent clients who cannot afford

to pay them and accordingly seek their fees pursuant to applicable fee-shifting

statutes.  If the District Court's theory was good law, then ALL attorneys

representing civil rights plaintiffs are equally guilty of fraud.  Moreover, if the

District Court's theory was good law, then enforcement of civil rights laws must be

restricted only to those plaintiffs who can afford to pay their attorneys when they

do not prevail.

---

[23] After this discussion, the Court awarded the amount of $650 paid to the expert, finding this to be reasonable. The docket reveals that this expert was Daniel Pezza. 1:20-cv-745, DE 19-5 (N.D. Ga.).

Even taken on its face, the Disciplinary Order's analysis is flawed. The client agreement language cited by the Order entitles us to fees and states that we will seek it from defendants. That unequivocally covers settlement agreements and the seeking of fees from defendants during negotiations. The Order's reasoning that the client agreements are flawed because they didn't cover *other* contingencies (such as losing), makes no sense. The Disciplinary Order, at pp. 17-19, 27, additionally opines that the phrase "good and valuable consideration" contained in settlement agreements constitutes a fraud on the basis that the plaintiff is not released from any obligation to pay his or her attorneys. This completely ignores the fact that the "good and valuable consideration" to the plaintiff is the defendant's agreement to comply with the ADA and that the "good and valuable consideration" to the defendant is, at a minimum, the release of claims and termination of the lawsuit.

Lastly, even if the Panel's interpretation is valid - that the terms of the client agreement does not support the recovery of fees - we would still be entitled to fees under the theory of quantum merit. See, e.g. *Oliver v. Groedel*, 206 N.E.3d 872 (Oh. App. 2023); *Guy Bennett Rubin, P.A. v. Guettler*, 73 So. 3d 809 (4th Dist. App. Fla. 2011); *Angino & Rovner v. Jeffrey R. Lessin & Assocs.*, 131 A.3d 502 (Pa. Super. 2016); *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm*

*of Malone Middleman, PC* 179 A.3d 1093 (Pa. 2018); *D'Jamoos v. Griffith*, 2006 U.S. Dist. Lexis 50757 (E.D. N.Y. 2006).

Accordingly, the Disciplinary Order's reasoning that we committed a fraud every time we requested fees (by misrepresenting that our clients paid us if we lost) is completely contrary to the statute and Supreme Court precedent. It is both factually and legally flawed.

**B.    *Excessive Fee Demands***

The Disciplinary Order next reasoned that my fee demands were excessive, but its findings are based on critical omissions of information that were thoroughly presented during the Investigation and simply omitted from the Investigator's Report.

The greatest oversight is the analysis of anticipated "future" time. The Investigator's Report, at p. 21, and Disciplinary Order, at p. 14, focused exclusively on whether I had incurred additional time AFTER a case had settled and been closed. However, this finding overlooks the fact that, when the demand is made, "anticipated future time" also includes all the additional time that is spent on a case after the demand is made, but the case continues to litigate until it is finally closed. It is impossible when the demand is made to predict which cases will resolve quickly, which cases will drag on for months and be hotly contested, and

which cases will fall somewhere in between the two extremes. In fact, many cases continued to vigorously litigate after the initial settlement demands were made. Indeed, the District Court was certainly aware of the significant amount of such "anticipated future time" as having been expended in the *Naranda* appeal, to this Court. It was certainly aware that Mr. Bacon had litigated the *Acheson* case through the First Circuit and all the way to the Supreme Court. It was likely aware of that Mr. Bacon had litigated cases all the way to the Eleventh, Fifth, D.C., Tenth and Second Circuits. Having previously addressed the issue of standing, the District Court was doubtless aware that we had responded to a daily onslaught of motions to dismiss in more than a dozen jurisdictions. This was in addition to the constant discovery, disclosures and other interactions with various defendants and their counsel.  In short, the estimated sum of $10,000 in anticipated future time was most certainly exceeded in countless cases. It being impossible to predict which cases would incur such expenditures at the time our demand was made, this was an opening demand and was negotiated downward.

We therefore always had a good faith basis for including our anticipated future time when we made those demands. Typically, the defendants who wished to settle quickly made a counteroffer and the cases then settled for much lower amounts. In this respect, the unincurred future time is implicitly subtracted off the

settlement amounts. In this way, the overwhelming bulk of our cases that settle

quickly have done so for far-far less than $10,000.00. Of the eleven settlements

referenced on p. 22 of the Investigator's Report, six settled for $3,500 or less. Only

one settled for more than $5000.

Therefore, there is nothing fraudulent or misleading about our fee demand

because "anticipated future time" can and frequently does exceed $10,000.00 as

the litigation continues. The Investigator and Disciplinary Order confined their

findings to the fact that I had not expended additional time AFTER cases had

closed, and they ignored the fact that I had indeed expended additional time

between the time of making the demand and BEFORE the case closed - on

innumerable cases.  By this singular fact alone, I always had a good faith basis to

seek my "anticipated future time" and the finding of unethical misconduct could

only be supported by cherry-picking the facts. In short, if either the Investigator or

Panel had recognized this aspect, they could not have found that I made any

misrepresentations to anyone.

Nor are defendants held hostage to any refusal on our part to end the

litigation in exchange for high fees.  Our fee demand expressly offers the option of

letting the court decide on the fee amount. If defendants wish to end the case but

cannot agree on the amount of fees, they can let the court decide. Even if this offer

had been absent, a defendant always can shut down a case by simply confessing

liability or file an answer which admits the allegations of the complaint, after

which it is liable only for the time and expenses incurred when the plaintiff's

attorney generated the complaint - and nothing more.

Again, the Disciplinary Order's legal conclusion here is devoid of precedent.

Quite simply, the undersigned is unaware of any other court having disciplined

another attorney for similar conduct.

Caselaw warns against courts getting involved in settlement negotiations.

*United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980)

("[P]rocedurally it would seem to be impossible for the judge to become involved

in overseeing a settlement [] because the parties are free at any time to agree to a

resolution of the dispute by private contractual agreement [] and to dismiss the

lawsuit by stipulation. . .. [T]he trial court plays no role in overseeing or approving

any settlement proposals."). The Fourth Circuit stated that "[o]ur federal courts

have neither the authority nor the resources to review and approve the settlement of

every case brought in the federal court system". *Smyth v. Rivero*, 282 F.3d 268,

280 (4th Cir. 2002), citing *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68

F.3d 828, 835 (3d Cir. 1995). In *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1189

(8th Cir. 1984), the Eighth Circuit held, "In ordinary litigation, that is, lawsuits

between private parties, courts recognize that settlement of the dispute is ***solely*** in the hands of the parties." (Emphasis supplied.) See also, *Heddendorf v. Goldfine*, 167 F. Supp. 915, 926 (D. Mass. 1958); *United States v. Louisiana*, 527 F. Supp. 509, 512 (E.D. La. 1981) (a trial court ordinarily plays little or no part in overseeing the settlement of a lawsuit). Courts not only frown on interference by trial judges in parties' settlement negotiations, but also renounce the practice of approving parties' settlement agreements. See *Levinson v. Maison Grande, Inc*., 553 F. Supp. 350, 352 (S.D. Fla. 1982). Indeed, Federal Courts do not even have jurisdiction when the parties enter a private settlement unless it involves a consent decree or other court order which adopts the agreement and retains jurisdiction to enforce it. *Buckhannon Bd. & Care Home v. W.Va. Dep't of Health & Human Res*., 532 U.S. 598 (2001); *Am. Disability Ass'n v. Chmielarz,* 289 F.3d 1315 (11th Cir. 2002). Accordingly, the private settlement agreement renders the attorney fee statute inapplicable.

Even the Investigator admits, on pp. 23 fn. 9 and 33, that the settlement amount does not need to correspond to the amount of attorney time expended. Thus, by the Investigator's own conclusion, criticism of our settlement amounts reached in settlements lacked legal foundation. At p. 23, fn. 9, he states:

> "...it is not impermissible to agree to a settlement amount
> that does not correspond with the value of the time that the

> Plaintiff's attorney expends on the case, just as litigants
> oftentimes agree to provide relief in a settlement that they
> could not otherwise have been forced to provide if the case
> went to trial. The rules of professional conduct, however,
> prohibit misrepresentation of the facts to opposing counsel
> during settlement negotiations and the filing of frivolous
> lawsuits with the hope of forcing nuisance settlements
> from defendants.

The Investigator's equivocation contained in the last sentence is unwarranted. First, there is no misrepresentation where I had in fact incurred anticipated future time in the continuing litigation of a large portion of cases BEFORE they closed (the aspect ignored by the Investigator and Court). Second, the Investigator's reference to frivolous lawsuits is entirely out of place: his having elsewhere in his Report, at pp. 30-32, found that the lawsuits were NOT frivolous.[24]

The finding of impropriety also critically overlooks that the option which makes the initial demand of $10,000 (Option "A") offers MORE than that to which a defendant is entitled. Indeed, under the Statute, defendants are entitled to nothing. Rather, they are legally obliged to fix their discriminatory conditions. They are not entitled to a settlement agreement. They are not entitled to a grace period of two years. They are certainly not entitled to a notice-and-opportunity to

---

[24] The Investigator's Report pre-dated this Circuit Court's decision in *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2/15/23), which further establishes that the lawsuits were not frivolous.

cure clause[25], and they are not entitled to a release from the plaintiff which includes any physical violations at the subject property. They are not entitled to a release from the plaintiff for anything. These items constitute additional consideration and benefits to the defendants to which they were not otherwise entitled. The only example cited by the Investigator as having settled for an excessive amount is Richbell Carrolton. Investigator Report, p. 22. However, the Richbell Carrolton defendant chose this option with the notice/opportunity to cure clause and extended release (having negotiated the fee amount down from the initial $10,000 demand) when it could have chosen a lesser option for a reduced sum (and negotiate down from the lesser initial demand of $6500). That defendant was represented by an attorney and the agreement was the result of arms-length negotiations. There was nothing unconscionable about it. This was Richbell's choice - having opted for the additional consideration of a notice and opportunity to cure clause, additional year to comply, and release that included any physical violations at the hotel[26]. This is far more than anything it was entitled to under the statute.

Inexplicably, the Investigator omitted the costs and expenses incurred when

---

[25] The Disciplinary Order, at p. 8, leaves this term out when it paraphrased the settlement demand.

[26] Of the eleven Maryland settlement agreements listed in the Investigator's Report, four defendants (including Richbell) opted for this additional consideration. See cases 1:20-cv-01327-ELH, 1:20-cv-1971, 20-CV-02325-TDC, and 1:20-cv-3607.

he compared the numbers and amounts. These include $400 for the filing fee, anywhere from $140 on up from the process server (depending on the amount of service attempts), and $650 paid to Daniel Pezza for his initial pre-suit investigations.

The Panel also rationalizes this omission by opining that Mr. Pezza performed no legitimate work. The Panel stated that Mr. Pezza does nothing more than simply re-hash findings already made by the Plaintiff. On the contrary, if we had filed complaints against hotels simply because our client said their websites were no good, we would be in violation of Fed. R. Civ. P. 11. We would have ended up wrongfully suing countless hotels that were following the law all along. Rule 11 requires that we have a duty to verify the veracity of a case before filing. The client's claims must be verified, and Pezza carried out the initial investigation in this regard. Pezza's services were the critical safeguard against wrongful suits being filed and Rule 11 being violated. Pezza performed the pre-suit investigation required of every case. He reviewed every page of every website utilized by a given hotel in taking reservations. This typically included, but was not limited to: Expedia, Orbitz, Booking.com, Hotels.com, Hotelplanner.com, Agoda, Travelocity, Reservations.com, Reservationdesk.com, Reservationcounter.com, etc., etc. He took screenshots of every page on every site used by the hotel. This

frequently amounted to well over a hundred screenshots in each case. He made sure that there was indeed no or insufficient information on the websites regarding accessibility. This sometimes can be hidden in a back page: Pezza made sure it was not. Pezza also made sure that, while the hotel site offers the option for booking regular rooms, it provided no similar option for any accessible rooms. This means that he must test the site for multiple dates to ensure that the date or dates selected by the plaintiff did not happen to simply be a date when all the disabled rooms were simply offline because they had been previously booked. This was a time-consuming process in each case, but necessary to ensure against Rule 11 violations.

Moreover, Pezza's pre-suit work provided us with the evidence we sometimes needed to establish the case during litigation. On many instances, defendants filed motions to dismiss claiming that their reservations systems were compliant before they were sued and submitted exhibits to that effect. In those cases, we were able to submit the screenshots taken by Pezza of the same pages to demonstrate how the defendant had altered them and was lying to the court. Indeed, Pezza's thorough pre-suit documentation has been submitted as exhibits in countless actions.[27] If not for our submission of Pezza's original screenshots, we

---

[27] In its Order Denying Reconsideration, the District Court opined that the Plaintiff's attorneys should have instead performed this investigation. However, this process would be no

would have potentially been liable under Rule 11. For these reasons, the work performed by Pezza was not only legitimate: it was essential.

The Disciplinary Order, at pp. 7-8, cites several cases which either declined to award Pezza's fees or reduced the fees. These do not support the conclusion that Pezza's fees are illegitimate or that ethical violations have been committed. *Kennedy v. Sun Coast Motels, Inc*., 8:18-cv-1688 (M.D. Fla. 12/21/18), cited by the Panel, imposed a reduction only because "no resume or affidavit is attached to the motion." *Kennedy v. KSK Invs., LLC*, 6:17-cv-640 (M.D. Fla. 11/24/2017), cited by the Panel, declined to award fees only because it was confused over the matter of Pezza being one of two experts[28] and because no affidavit was submitted. *Kennedy v. Bonom Ent*., 18-cv-62175 (S.D. Fla. 3/29/19), only denied Pezza's fees because insufficient documentation had been submitted.

The Disciplinary Order conveniently overlooked the many instances in which courts awarded the fees incurred with respect to Mr. Pezza's work. See

---

less time-consuming, and costs and fees would either have been the same or higher. Indeed, the exercise for a single hotel takes several hours to perform. Moreover, this would have placed the attorneys in potential violation of Model Rule 3.7 in the event the lawyer would have had to serve as the authenticating witness for any screenshots submitted as exhibits.

[28] This case did not involve a hotel's online reservations system, but instead involved violations located at a physical property. Pezza had acted as the initial pre-suit investigator and a different expert performed the Rule 34 inspection. Indeed, Pezza had previously served as a pre-suit investigator of physical violations at physical properties for several years. While he was not a general contractor or architect, he has thorough knowledge of the ADA's physical specifications (i.e. 2010 ADA Stds. For Accessible Design) and has proven to be an excellent and reliable pre-suit investigator.

*Kennedy v. Shree Ram Jalaram, Inc.*, 19-60708-DPG, DE 12-10, p.  4 and DE 13 (S.D. Fla. 4/18/2019); *Kennedy v. Dockside View, LLC*, 2:18-cv-14444-KAM, DE 8-13 and DE 8 (S.D. Fla. 1/19/19); *Kennedy v. Astoria Hotel Suites, LLC*, 19-cv-60150-WPD, DE 15-10 and DE 18 (S.D. Fla. 3/22/19); *Kennedy v. Pramukh Jivan, Inc.*, 0:19-cv-61943-WPD/Snow, DE 21, pp. 2, 5 (S.D. Fla. 1/13/20);  *Kennedy v. H & D Hotels, LLC*, 19-60548-UU, DE 10-10, p 4 and DE 12 (S.D. Fla.2019); *Kennedy v. Blarimir Moreno*, 19-cv-60550-Altman/Hunt, DE 23-10, p. 5 and DE 26 (S.D. Fla. 1/16/2020); *Kennedy v. Shiva Lodging, Inc.*, 19-cv-62819-Altman/Hunt DE 20-10 p. 5, DE 23, DE 25 (S.D. Fla. 4/6/20); *Kennedy v. PR Tahiti, LLC*, 0:19-cv-62264-HS, DE 21-10 p. 4, DE 25 pp. 6-7, DE 26 (S.D. Fla. 12/3/20); *Kennedy v. AP2 Cedartown, LLC*, 0:19-cv-63081-RS, DE 25-1, pp 12-13, DE 27 pp. 6-7, DE 28 (S.D. Fla. 12/3/20); *Sarwar v. Lake Placid Hotel Partners, LLC*, 8:20-cv-1387-TJM-ATB, DE 18-7, DE 19 p.6  (N.D.N.Y. 3/21/22); *Kennedy v. Shivnit, Inc*., 18-cv-63094-UU, DE 10-4, para. 4 and DE 12 (S.D. Fla. 2019) (reference to "costs" in Court award included Pezza's fees);

*Kennedy v. Londamerican Real Estate Ltd.*, 19-cv-61228-SMITH/VALLE, DE 18 (S.D. Fla. 8/21/2019).

The Disciplinary Order's conclusion on this point is based on the notion that

my demand for reimbursement for Pezza's fees was so lacking in authority or

factual basis that it amounted to fraud, misrepresentation and an ethical violation.

In other words, there was not even a colorable right to make the demand. For the

reasons above, even if a court disagrees that we are entitled to reimbursement for

Pezza's fees, we still had ample basis to make the request in good faith. In any

event, taking a position among conflicting authorities and denying the award of

fees for Pezza's services is one thing. But concluding that ethics were breached,

and discipline should be imposed is quite another. Moreover, at no point prior to

the hearing were we ever put on notice of this concern. The Investigator's Report,

for example, made no mention of this issue.  If it had been timely raised, we would

have been happy to elucidate this matter.  Instead, the Disciplinary Order simply

made sweeping conclusions with no factual basis. Again, this factual finding made

of thin air was critical to the District Court's conclusions of ethical misconduct.

The Investigator also criticized me for my time sheets as being excessive. In

this regard, the Investigator requested the timesheets I had in my files regarding the

several cases I handled in the District of Maryland. However, I never gave these

timesheets to any third party and never filed them in any court. There was no

misrepresentation made to anybody: defendant, defense counsel, court or any third

party. Rather, the Investigator requested these records, and I produced them in their

rough form without alteration. Until that time, these were exclusively part of my files: never shared with anyone. He examined them and then claimed they were part of a misrepresentation even though they were never actually presented to anyone in the first place.

The Disciplinary Order and Investigator also concluded that I had misrepresented my time with respect to fee petitions filed in various courts - none of which were within the District of Maryland. However, the only finding in this regard was that I had supposedly inflated the time I billed for "drafting and filing Complaints". Investigator's Report, p. 34.[29] The Investigator and Disciplinary Order also stated that I continued in this pattern despite being put on notice that it was unethical. To the contrary, never during the Investigation did the Investigator give me any indication that this was an area of concern. While he asked questions about my billing, he gave no indication that this was problematic. I was only first put on notice when I received the Investigator's Report in March 2022. Moreover, the Disciplinary Order's findings overlook the fact that my most recent fee

---

[29] This task - the commencement of a case - does indeed consume considerable time. This includes: review of the screenshots and report, an independent review of a hotel's online reservations system, ascertainment of the county of the hotel, research in the county tax or property records into the identity of the owner/operator of the hotel, research of applicable state corporate database regarding the corporate identity and registered agent, docket research as to the existence of prior ADA filings, drafting the section of the complaint describing the violations, plugging relevant information into the complaint, proof-reading the complaint, drafting client authorization forms, providing the draft materials to the client, reviewing the client authorization to proceed, completion of summons, civil cover sheet and filing.

petitions (filed on 3/17/22 and 3/30/22) billed only 0.5 hours on this point. In other

words, once I was put on notice that there was a concern regarding my single

billing entry regarding the drafting of complaints, I corrected the matter.

The Investigator recommended only that I be warned:

> because [the fee petitions] do not appear to be egregious
> enough to warrant formal discipline, at least not before a
> warning is issued. Moreover, the fact that Mr. Gillespie's
> internal timesheets reflect excessive hours on a given day
> may be the product of sloppy record-keeping rather than
> intentional misconduct.

Report, p. 35.

The Investigator also stated:

> Additionally, such conduct is not a regularly disciplined
> matter. Mr. Gillespie's fee petitions have been accepted by
> the other jurisdictions without reduction, let alone
> discipline. The dockets of the federal courts are rife with
> orders awarding attorneys' fees far below the amounts
> sought in petitions. Most of those reduced awards are
> undoubtedly due to a finding that time was inefficiently
> spent, rather than a finding that the representation that the
> time was spent at all. But severe discipline for such
> "fudging" should be reserved for egregious cases.

Report, pp. 35-36. As the Investigator noted, I had received no notice from any

other court of any problem in my fee petitions, even though courts routinely reduce

attorney time in such instances. Therefore, my conduct was not of sufficient nature

to warrant discipline.

On pp. 10-11, the Disciplinary Order references the Investigator's finding that "the requested attorney hours are 'implausibly high,' and continued to be even after at least one court in 2018 found that similar requests by Gillespie's partner, Bacon, were unreasonable."  The Investigator and Disciplinary Order cited *Kennedy v. Satya Group, LLC*, 2:17-cv-14393(S.D. Fla. 1/3/2018)[30], but a careful review of that case does not support this conclusion.  On p. 6 of that opinion, at DE 15, it is revealed that Bacon had billed only 0.4 hours and that the court's reference to "84 minutes" was to combined time that included a different attorney. There is nothing in the opinion that indicates what, if any, portion of that criticism was directed at Mr. Bacon specifically. Moreover, Bacon's 0.4 hours was for drafting the section of the complaint that described the specific violations. In other words, the passage drafted by Mr. Bacon pertained to the specifics of that particular property.  *Satya* was not a case involving online reservations but was instead about physical violations located at a physical location. That required a different set of tasks: specifically, Mr. Bacon reviewed all the photographs taken during the pre-suit investigation, ascertained whether they depicted violations of the required standards for accessible design (2010 ADA Stds. For Accessible Design or prior

---

[30] On p. 24, fn. 12, the Disciplinary Order included the factual finding that I had filed a fee petition in the Satya case. To the contrary, as that docket reveals, I was never an attorney in that case.

1992 Americans with Disabilities Act Accessibility Guidelines ADA Architectural Guidelines - "ADAAGS") and drafted the section of the complaint which described those violations. This passage is unique to that case because it describes the physical violations located at that specific property. 0.4 hours for this task is entirely reasonable and falls far short of a basis for disciplinary actions.

### C.    "Familial Relationship" Between Pezza and Laufer

The Disciplinary Order also gratuitously implies at an improper relationship between Pezza and Laufer because Pezza fathered a child with Laufer's daughter. As with the other concerns, I was given no advance notice of this charge. If I had, I would have been able to prepare and present a strong defense.

The Disciplinary Order described this issue as nothing more than "unanswered" and without any "firm conclusions". If, in its twenty-month investigation, the Panel had explored this matter, it would have found no wrongdoing. Recently, Laufer submitted a declaration with the Supreme Court on this point. Exhibit E hereto. As Laufer explains, at paras. 10, et seq., she was not involved with the relationship between Pezza and her daughter, never received any money from him, and, to the best of her knowledge, Pezza never provided any meaningful child support. The relationship between Pezza and her daughter played no part in her motivation to serve as an ADA Plaintiff. The Disciplinary Order, at

p. 28, cites the transcript of the hearing before Judge Gallagher in stating that Pezza was the boyfriend who would accompany Laufer on her upcoming cross-country trip and that the "granddaughter" was Pezza's child. However, the hearing transcript does not support this finding, and, in any event, it is not true. As set forth in Laufer's Declaration, at para. 14, the boyfriend was somebody else and the granddaughter had no relationship with Pezza. Moreover, in the event it weighed into the Disciplinary Order's harsh decision to discipline me, such would have been entirely improper, since the Panel did nothing more than baselessly speculate whether Laufer and Pezza engaged in something improper.

The Disciplinary Order states, at p. 28, "while the Panel seriously questions whether any such payments to Pezza were for legitimate services rendered, it leaves unanswered whether Laufer improperly received any such funds as compensation for her part in the tester litigation". Payments made to Pezza were entirely legitimate. The services he performed with respect to pre-suit investigations of hotel online reservations systems is described *supra*. Pezza performed these same services not just for Laufer cases, but also for Sarwar cases and another client. He was paid the same amount for his work associated with other clients. Prior to that, he also performed pre-suit investigations on behalf of a vision impaired client in cases involving the failure of a place of public

46

accommodation to provide the coding in their commercial websites necessary to make them compatible with screen reader software. He was paid the same fees. Prior to that, Mr. Pezza worked for multiple years performing pre-suit inspections of physical places of public accommodation to document violations of the 2010 ADA Standards for Accessible Design and ADAAGs. In sum, Mr. Pezza's services were always legitimate and entirely necessary.

To reiterate, Pezza never gave any monies to Laufer, and the Disciplinary Order's "unanswered question" has no place in a disciplinary order as severe as this.

### D.    Duty To Correct Sarwar Testimony

Lastly, the Disciplinary Order states that I failed to correct the testimony of Saim Sarwar when he testified during a Vermont hearing that Pezza was not paid. I did not know at that time whether Pezza was paid to accompany Sarwar on his trip through that area. Pezza was not, in fact, paid to accompany Sarwar on that trip.

### E.    No Further Proceedings Are Warranted

In addition to the vacatur of the Disciplinary Order, I request that no further proceedings occur. As the District Court's Order indicates, I have already served the full disciplinary sentence – four months. Therefore, for the reasons set forth by this Court in *Nell v. United States*, 450 F.2d 1090, 1093 (4th Cir. 1971), no further

proceedings are warranted.

## VI.    Conclusion

For the foregoing reasons, I respectfully request that the District Court's

Order be reversed and vacated.

Respectfully submitted,

By: */s/ Tristan W. Gillespie*

Tristan W. Gillespie, Esq.
600 Blakenham Ct.
Johns Creek, GA 30022
404-276-7277
Gillespie.tristan@gmail.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with F.R.A.P. 32(a)(7) and

contains fewer than 13,000 words. Specifically, the brief has 10,045 words.  The

typeface and font are Times New Roman 14 pt.

By: */s/ Tristan W. Gillespie*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 21, 2024, I sent the foregoing by overnight

delivery to this Circuit Court and mailed a copy of the same to Evan T Shea, Venable

LLP, 750 E. Pratt Street, Suite 900, Baltimore, MD 21202.

By: */s/ Tristan W. Gillespie*

 **EXHIBIT A**

750 E. PRATT STREET    SUITE 900    BALTIMORE, MD 21202
**T** 410.244.7400    **F** 410.244.7742    www.Venable.com

Evan Shea
**T 410-528-4649**
**F 410-244-7742**
etshea@venable.com

March 19, 2021

**VIA EMAIL**

Tristan W. Gillespie
5150 Cottage Farm Rd.,
Johns Creek, GA 30022

> **Re:    Request for Information**

Mr. Gillespie:

I am writing to follow up on our telephone call of March 16, 2021.  As we discussed, I was appointed by Chief Judge James K. Bredar of the United States District Court for the District of Maryland as an Attorney-Investigator to conduct an investigation of your conduct.  As part of that investigation, I am requesting that you provide the following documents and information as soon as possible, but no later than Friday, April 2, 2021:

1. Any complaints that you have filed in the United States District Court for the District of Maryland alleging violations of the Americans with Disabilities Act.

2. Any communication with any person or entity located within the District of Maryland against whom you've represented a client in filed or threatened litigation under the Americans with Disabilities Act, including but not limited to any communications demanding relief under the Americans with Disabilities Act and any agreements settling the filed or threatened litigation.

3. Any documents or communications related to any fee arrangement with any client whom you've represented in connection with any filed or threatened litigation in the District of Maryland under the Americans with Disabilities Act, including but not limited to any engagement letter or other materials describing your or the client's compensation arising out of the relationship.

4. Any documents or communications reflecting or referring to payments to or from a client (invoices, checks, wire transfers etc.) that you represented in any filed or threatened litigation in the District of Maryland.

5. Any documents or communications, including policies or procedures, related to your efforts to evaluate the veracity of your clients' claims, including those related to their standing to file suit, under the Americans with Disabilities Act.

March 19, 2021
Page **2** of **2**

6. Any documents or communications related to the preparation for your client's testimony at the December 1, 2020 hearing before Judge Stephanie A. Gallagher in *Laufer v. Naranda Hotels, LLC*, Civil Action No. SAG-20-2136 and *Laufer v. Fort Meade Hospitality, LLC*, Civil Action No. SAG-20-1974.

7. Any documents or communications reflecting or supporting the calculation of attorneys' fees demanded in any filed or threatened litigation under the American Disabilities Act in which you represented a client in the District of Maryland.

8. Any petition or other request for attorneys' fees that you submitted to any court in an action brought on behalf of a client under the Americans with Disabilities Act, including all supporting documents.

Please respond with documents or communications that are in your possession, custody, and control, including but not limited to those in the possession of any employees.

As you know, the Maryland Attorneys' Rule of Professional Conduct 19-308.1 requires attorneys to cooperate with bar counsel's requests for information and documents. With that in mind, I hope that you will promptly reply with the materials requested. Please let me know if you have any questions, and I would be happy to discuss further.

Very truly yours,

/s/

Evan Shea

Cc:    Thomas Bacon, Esq.

 Gmail          **EXHIBIT B**                    Tristan Gillespie <gillespie.tristan@gmail.com>

---

**Dist. of MD**

---

**Shea, Evan T.** <ETShea@venable.com>
To: Tristan Gillespie <gillespie.tristan@gmail.com>
Cc: "Vitti, Anthony J." <AJVitti@venable.com>

Tristan,


In advance of the hearing on September 23, 2022, we have a couple follow up requests for information.  Please provide this informat
able, but not later than August 10, so that we have time to include consideration of it in any submission we make to the Court.


1. We've received the fee petition's you've submitted since July 22, 2021 that you provided to the Court.  Do you still provide defer
   offer at the outside of the case (example attached - - Ex. 8 to our report)?  If not, is there a new, standard settlement offer you pr
   provide us an example of that offer?


2. Regarding the "Standard ADA Fee Agreements" (example attached) that you produced to us, please tell us: a) whether you repr
   these are contingent fee agreements (you only get paid if you recover fees from the defendant), (b) whether you ever bill your cl
   (c) whether you ever collect attorneys' fees from your clients.


3. We've obtained a transcript from an April 18, 2022 hearing on a motion dismiss in one of your cases in the District of Vermont, S
   118.  We are concerned about the portion of Mr. Sarwar's testimony highlighted in the second attachment and below.  In particu
   Pezza is your paid expert witness/investigator in each of your cases.  Contrary to that, however, Mr. Sarwar testified at this hear
   "helping him out" on his trip in New England, and that Mr. Pezza doesn't work for Mr. Sarwar nor is he paid by Mr. Sarwar or any
   Sarwar.  Is there any further information/clarification you can provide about this testimony?


Thank you, and happy to have a call to discuss these questions further if that would be helpful,

Evan

10/8/24, 4:38 PM                                    Gmail - Dist, of MD

```
10    Q.    Okay.  So did someone else drive you around New

11    A.    Yes.

12    Q.    Okay.  And that would be Daniel Pezza?

13    A.    Yes.

14    Q.    Okay.  And so, in addition to your planning to

15    of these places, that would necessarily involve Dani

16    also planning for this trip, right?

17    A.    I planned the trip, and I gave him the details.

18    Q.    You gave him the details?  Does he work for you

19    A.    No.  He was helping me out.

20    Q.    And does he get paid for his helping you --

21    A.    No.

22    Q.    -- by anyone?

23    A.    No.
```

Evan T. Shea, Esq. | Venable LLP
t 410.528.4649 | f 410.244,7742 | m 443.900.3373
750 E. Pratt Street, Suite 900, Baltimore, MD 21202

ETShea@Venable.com | www.Venable.com

**************************************************************
This electronic mail transmission may contain confidential or privileged information. If
you believe you have received this message in error, please notify the sender by reply
transmission and delete the message without copying or disclosing it.
**************************************************************

3 attachments

📄 **Exhibit 8_Example Settlement Communication.pdf**
186K

📄 **Fee Agreement.pdf**
159K

📄 **Gillespie-MotiontoDismissHearing_SaimSarwar-04182022.pdf**
306K

10/8/24, 4:47 PM                                    Gmail - Dist, of MD

 Gmail                     **EXHIBIT C**              Tristan Gillespie <gillespie.tristan@gmail.com>

---

## Dist. of MD

**Tristan Gillespie** <gillespie.tristan@gmail.com>                    Wed, Aug 10, 2022 at 11:07 AM
To: "Shea, Evan T." <ETShea@venable.com>
Cc: "Vitti, Anthony J." <AJVitti@venable.com>
Bcc: Thomas Bacon <tbb@thomasbaconlaw.com>

Hi Evan,

Here are the responses to your questions>>:

> 1. *Court. Do you still provide defendants the same settlement offers at the outside of the case (example attached - - Ex. 8 to our report)? If not, is there a new, standard settlement offer you provide, and if so, could you provide us an example of that offer?*

The short answer is we have not changed our initial settlement offer. The longer answer is there are no more settlement offers as we have more or less closed up shop. I haven't filed a new ADA case since January of this year. I have 10 remaining open ADA cases now that I am actively trying to dismiss.

> 2. *Regarding the "Standard ADA Fee Agreements" (example attached) that you produced to us, please tell us: a) whether you represent to your clients that these are contingent fee agreements (you only get paid if you recover fees from the defendant), (b) whether you ever bill your clients for legal services, and (c) whether you ever collect attorneys' fees from your clients.*

The clients are made aware that these are strictly contingent fee cases where we seek our attorney fees from the defendants. We don't bill our clients and we've never recovered any money from them.

> 3. *We've obtained a transcript from an April 18, 2022 hearing on a motion dismiss in one of your cases in the District of Vermont, Sarwar v. Patel, 5:21-cv-118. We are concerned about the portion of Mr. Sarwar's testimony highlighted in the second attachment and below. In particular, we understand that Mr. Pezza is your paid expert witness/investigator in each of your cases. Contrary to that, however, Mr. Sarwar testified at this hearing that Mr. Pezza was "helping him out" on his trip in New England, and that Mr. Pezza doesn't work for Mr. Sarwar nor is he paid by Mr. Sarwar or anyone else for helping Mr. Sarwar. Is there any further information/clarification you can provide about this testimony?*

Mr. Sarwar suffers from Cerebral Palsy, so he doesn't process information very well. It is correct that he does not pay Mr. Pezza. Nor was Mr. Pezza paid for taking his trip with Mr. Sarwar. However, Mr. Pezza was the initial investigator on the ADA cases and Mr. Bacon paid him for his services in that regard.

Please don't hesitate to call or write with any other questions you may have.
Thanks,
Tristan


Tristan W. Gillespie, Esq.

404-276-7277


On Mon, Jul 25, 2022 at 2:47 PM Shea, Evan T. <ETShea@venable.com> wrote:

> Tristan,

USCA4 Appeal: 24-1810      Doc: 12      Filed: 10/21/2024      Pg: 54 of 60

In advance of the hearing on September 23, 2022, we have a couple follow up requests for information.  Please provide this information as soon as you are able, but not later than August 10, so that we have time to include consideration of it in any submission we make to the Court.

1. We've received the fee petition's you've submitted since July 22, 2021 that you provided to the Court.  Do you still provide defendants the same settlement offer at the outside of the case (example attached - - Ex. 8 to our report)?  If not, is there a new, standard settlement offer you provide, and if so, could you provide us an example of that offer?

2. Regarding the "Standard ADA Fee Agreements" (example attached) that you produced to us, please tell us: a) whether you represent to your clients that these are contingent fee agreements (you only get paid if you recover fees from the defendant), (b) whether you ever bill your clients for legal services, and (c) whether you ever collect attorneys' fees from your clients.

3. We've obtained a transcript from an April 18, 2022 hearing on a motion dismiss in one of your cases in the District of Vermont, Sarwar v. Patel, 5:21-cv-118.  We are concerned about the portion of Mr. Sarwar's testimony highlighted in the second attachment and below.  In particular, we understand that Mr. Pezza is your paid expert witness/investigator in each of your cases.  Contrary to that, however, Mr. Sarwar testified at this hearing that Mr. Pezza was "helping him out" on his trip in New England, and that Mr. Pezza doesn't work for Mr. Sarwar nor is he paid by Mr. Sarwar or anyone else for helping Mr. Sarwar.  Is there any further information/clarification you can provide about this testimony?

Thank you, and happy to have a call to discuss these questions further if that would be helpful,

Evan

Evan T. Shea, Esq. | Venable LLP
t 410.528.4649 | f 410.244.7742 | m 443.900.3373
750 E. Pratt Street, Suite 900, Baltimore, MD 21202

ETShea@Venable.com | www.Venable.com
[Quoted text hidden]

# EXHIBIT E

**APPENDIX**

# TABLE OF CONTENTS

Appendix A
    Declaration of Deborah Laufer...........................1a

1a

## APPENDIX A

## <u>DECLARATION OF DEBORAH LAUFER</u>

1.    My name is Deborah Laufer. I am a resident of Pasco County, Florida.  More than a decade ago, I was diagnosed with multiple sclerosis. I am visually impaired, I have limited use of my hands, and I must use a wheelchair or cane to move around.

2.    After my diagnosis with multiple sclerosis, I became unable to continue in my career providing private security as an executive protection specialist. My career was important to me because I value being able to help people, and I fell into a depression when I thought I had lost the ability to do that.

3.    Once I needed a wheelchair to move around, I became extremely frustrated at how difficult it was to reserve an accessible room at a hotel when I would travel. I could not get information about accessible rooms, or I would book a room that claimed to be accessible, but it ended up not being accessible or available when I arrived. I sometimes ended up sleeping in my car because I could not get an accessible room at a hotel.

4.    In 2018, my daughter was in a romantic relationship with Daniel Pezza. I learned from him that he worked as an investigator for attorney Thomas Bacon, who brought lawsuits to enforce the ADA. I told him that I was interested in getting involved in their work, so Mr. Pezza introduced me to Mr. Bacon, who became my attorney in or around May 2018.

5.    I saw this as an opportunity to help myself and other people with disabilities who want to visit their

families and to travel. Serving as an ADA plaintiff helped get me out of my depression because it allowed me to help myself and other people.

6.  My daughter and Mr. Pezza had a child in January 2019. They ended their relationship later that year. My daughter has full custody of their child. She also has an older daughter who has a different father.

7.  After my daughter and Mr. Pezza split up, I continued to work with Mr. Pezza. I did not let Mr. Pezza's relationship with my daughter affect my desire to continue to advocate on behalf of myself and other disabled people.

8.  When I was looking at hotel websites (often because I was considering making travel plans) and found an online reservations system that did not appear to have the accessibility information required by the ADA, I would refer it to Mr. Pezza and he would look into it further. If Mr. Pezza's investigation determined that the reservation system clearly and substantially violated the ADA, and Mr. Bacon and I agreed that a lawsuit should be brought, then Mr. Bacon, or another attorney working with Mr. Bacon, would file a case on my behalf. It is my understanding that the attorneys paid Mr. Pezza for this work, but I had no involvement in that arrangement.

9.  I understand that Title III of the ADA does not allow plaintiffs to get monetary damages, and I did not expect to receive any money. I have never received any payments for my federal ADA claims. I have received monetary damages a few times in lawsuits brought under state law.

10.  It was recently brought to my attention that an

3a

order disciplining an attorney who represented me in cases in the District of Maryland raised questions about my "familial relationship" with Mr. Pezza. I understand that the order suggests that there may have been improprieties about Mr. Bacon and the other attorneys who have represented me paying Mr. Pezza for his work because of this relationship.

11. Mr. Pezza has never given me money or anything else of material value.

12. I live with my daughter and her two children, who moved in with me after Mr. Pezza and my daughter broke up. My daughter and I keep separate finances and split shared household costs. I do not know the details of whether Mr. Pezza pays child support to my daughter or how much, and I generally do not know the details of their relationship (if any) after they split up in 2019. Based on a recent conversation with my daughter, it is my understanding that Mr. Pezza has never paid a meaningful amount of child support.

13. It is also my understanding that the disciplinary order talks about testimony I gave at an evidentiary hearing in 2020 in one of my cases in Maryland about a cross-country trip I had planned. I understand that the judge in that case did not believe that I would take as extensive a trip as I said I would.

14. In my testimony in 2020, I said that I planned to take the trip with my daughter, her boyfriend, and my granddaughter. This boyfriend was not Mr. Pezza; my daughter and he had broken up by that time. The granddaughter was my daughter's older daughter, who is not Mr. Pezza's child.

4a

15. In the summer of 2021, I took the cross-country road trip I had planned. I ended up traveling with my sister (instead of my daughter) and my older grand-daughter (who I had originally planned to travel with, and who is not Mr. Pezza's daughter). My road trip started in Florida, and we then traveled through a number of states, including but not limited to Louisiana, Texas, Colorado, Illinois, Pennsylvania, New York, and Virginia, and then back home to Florida.

16. In the course of the disciplinary investigation into my attorney in Maryland, I provided the investigator with receipts, photos, and videos documenting my trip.

17. I have always wanted my cases to focus solely on enforcing the ADA so that I and people like me can enjoy the rights the ADA provides us. I have decided to dismiss this and my other lawsuits because I do not want any allegations of misconduct committed by my attorney in Maryland to distract from these important issues.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


   /s *Deborah Laufer*           
Deborah Laufer

Executed on: <u>July 23, 2023</u>